UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MIR LATIF AHMAD,<br><br>　　　　　　　　　Petitioner,<br><br>　　v.<br><br>MATTHEW WHITAKER,[1] et al.<br><br>　　　　　　　　　Respondents. | CASE NO. C18-287-JLR-BAT<br><br>**REPORT AND RECOMMENDATION** |

## INTRODUCTION

This case presents yet another example of U.S. Immigration and Customs Enforcement ("ICE") causing unnecessary pain to a family already facing heartbreak. Mir Latif Ahmad is subject to a final order of removal but had been living peacefully in the community with his U.S. citizen wife and children on an order of supervision ("OSUP") since 2005. In December 2017, ICE verbally granted his request to take a family trip to visit his elderly parents in Oregon after Christmas, but required him to check in prior to his departure on December 26, 2017. That morning, he and his wife reported to the ICE office expecting to get formal approval for their family trip. Instead, ICE detained him without any opportunity to say goodbye to his children or

---

[1] On November 7, 2018, Matthew Whitaker became the Acting Attorney General of the United States Department of Justice. Pursuant to Federal Rule of Civil Procedure 25(d), he is automatically substituted as the proper party in his official capacity. The Clerk shall update the docket accordingly.

REPORT AND RECOMMENDATION - 1

elderly parents.  Later that day, he learned that ICE had obtained a travel document and scheduled his removal to Afghanistan for January 9, 2018.

Mr. Ahmad filed this 28 U.S.C. § 2241 immigration habeas action *pro se* to challenge the revocation of his OSUP and his continued detention at the Northwest Detention Center.  He seeks release on reasonable conditions so that he may make an orderly departure from the United States or, in the alternative, a bond hearing.  The Government has moved to dismiss.  Having considered the parties' submissions, the balance of the record, and the governing law, the Court recommends (1) with respect to Mr. Ahmad's challenge to the revocation of his OSUP and his request for release, the Government's motion to dismiss should be **GRANTED** and Mr. Ahmad's habeas petition should be **DENIED**, and (2) with respect to Mr. Ahmad's request for a bond hearing, his habeas petition should be **GRANTED** and he should be afforded a bond hearing within seven days of the Honorable James L. Robart's order on this Report and Recommendation, if he has not been removed by that time.

## BACKGROUND

Mr. Ahmad, a citizen of Afghanistan, became a lawful permanent residence of the United States in the 1980s.  Dkts. 9-1, 9-2, 9-3.  On October 1, 2001, ICE's predecessor, the Immigration and Naturalization Service ("INS") took him into custody and issued a Notice to Appear, which charged him with removability pursuant to 8 U.S.C. § 1227(a)(2)(A)(iii) (a noncitizen who has been convicted of an aggravated felony relating to sexual abuse of a minor is removable), based on a 1991 state-court conviction for second degree child molestation.  Dkts. 9-4, 9-5, 9-6, 9-7.  On October 31, 2001, an immigration judge ("IJ") released Mr. Ahmad on bond.  Dkt. 9-8.

On May 15, 2002, an IJ held a hearing and ordered Mr. Ahmad removed to Afghanistan.

REPORT AND RECOMMENDATION - 2

1   Dkts. 9-9, 9-10.  Mr. Ahmad's appeal to the Board of Immigration Appeals ("BIA") was

2   unsuccessful.  Dkts. 9-11, 9-12.

3         In September 2002, Mr. Ahmad married his wife, Mariah Ahmad Lynge.[2]  Dkt. 2 at ¶ 4.

4   In December 2002, Ms. Lynge filed an Application for Alien Relative (Form I-130) for Mr.

5   Ahmad based on their marriage.  *Id.* at ¶ 4.  On December 16, 2004, Mr. Ahmad and Ms. Lynge

6   attended an I-130 application interview with U.S. Citizenship and Immigration Services

7   ("USCIS").  *Id.* at ¶ 5.  During the interview, Mr. Ahmad was arrested and taken into

8   immigration custody without explanation.  *Id.* at 5.

9         INS detained Mr. Ahmad until August 30, 2005, while it attempted to execute his

10  removal order, but it ultimately released him on an OSUP because it was unable to complete his

11  "deportation or removal during the period prescribed by law."  Dkts. 9-13, 12-3; *see also* Dkt. 10

12  at ¶¶ 12, 15; Dkt. 12 at ¶ 5.  The OSUP required Mr. Ahmad to comply with a number of

13  conditions, including that he "appear in person at the time and place specified, upon each and

14  every request of the Service, for identification and for deportation or removal."  Dkt. 9-13 at 2;

15  Dkt. 12-3 at 2.  Mr. Ahmad acknowledged that "failure to comply with the terms of this order

16  may subject [him] to a fine, detention, or prosecution."  Dkt. 9-13 at 2; Dkt. 12-3 at 2.  After his

17  release, Mr. Ahmad complied with all of the conditions of his OSUP and ICE's requests for

18  assistance in procuring a travel document.  *See* Dkts. 9-13 at 6, 9-15, 9-16; Dkt. 10 at ¶¶ 22-24;

19  Dkt. 1-1 at ¶¶ 11-12, 14.

20        In 2016, Mr. Ahmad and Ms. Lynge inquired about the status of her December 2, 2002

21  Form I-130 petition, which had not yet been resolved.  Dkt. 2 at ¶ 9.

22

23

---

[2] Ms. Lynge is currently an immigration attorney who has represented Mr. Ahmad in his immigration proceedings but is not representing him in this action.  Dkt. 2 at ¶ 3.  They have two school age children.  Dkt. 1 at ¶ 22.

REPORT AND RECOMMENDATION - 3

1    On August 4, 2017, ICE renewed its efforts to remove Mr. Ahmad by presenting a travel
2 document request for him to the Embassy of Afghanistan ("the Embassy"). Dkt. 10 at ¶ 25; *see*
3 *also* Dkt. 9-15. On August 10, 2017, Ms. Lynge's Form I-130 application was approved. Dkt. 2
4 at ¶ 9. Mr. Ahmad and Ms. Lynge informed ICE that the application had been approved. *Id.*
5    On October 25, 2017, at ICE's request, an official from the Embassy interviewed Mr.
6 Ahmad. Dkt. 10 at ¶¶ 27-28. On November 13, 2017, the Embassy issued a temporary travel
7 document for Mr. Ahmad that expired on February 12, 2018. Dkt. 10 at ¶ 29; Dkt. 10-1. On
8 November 21, 2017, during a routine check-in, Mr. Ahmad and Ms. Lynge showed ICE a draft
9 of a motion to reopen Mr. Ahmad's removal proceedings that they were preparing to file, which
10 was based on the newly granted I-130 application and the hardships that removal would place on
11 their family. Dkt. 2 at ¶ 11. ICE responded by fitting Mr. Ahmad with a GPS ankle monitor.
12 Dkt. 2 at ¶ 11; Dkt. 10 at ¶ 30; Dkt. 10-3 at 3. ICE did not inform him at this time that they had
13 obtained a travel document. Dkt. 1-1 at ¶ 15. Instead, Mr. Ahmad and Ms. Lynge were told the
14 ankle monitor was for "accountability purposes." Dkt. 2 at ¶ 11.
15    On November 27, 2017, Mr. Ahmad filed a motion to reopen his removal proceedings
16 with the BIA, which ICE opposed. Dkt. 2 at ¶ 12; Dkt. 10 at ¶¶ 31-32; Dkt. 10-3 at 3.
17    On December 12, 2017, ICE scheduled Mr. Ahmad for a chartered departure to
18 Afghanistan, which was set to take place on January 9, 2018. Dkt. 10 at ¶ 33; Dkt. 10-3 at 3.
19    On December 18, 2017, Mr. Ahmad and Ms. Lynge requested permission to travel with
20 their family to visit his elderly parents in Oregon for several days after Christmas. Dkt. 2 at ¶ 13;
21 Dkt. 2-5. ICE verbally approved the request but required Mr. Ahmad to personally check-in at
22 the GPS monitoring service's office prior to leaving on December 26, 2017. Dkt. 2 at ¶ 13; Dkt.
23 2-5. On the morning of December 26, 2017, Mr. Ahmad and Ms. Lynge went to the monitoring

REPORT AND RECOMMENDATION - 4

service's office where they were told to check in at the ICE office. Dkt. 2 at ¶ 14. When they checked in with ICE, Mr. Ahmad was detained. *Id.* He was not given a chance to say goodbye to his children or elderly parents. *Id.* Ms. Lynge asked why he was being detained and whether ICE had a travel document. *Id.* The ICE officer told her that he was subject to a final order of removal and ICE did not need a travel document remove him. *Id.*

Later that day, ICE served Mr. Ahmad with a Notice of Revocation of Release. Dkt. 10-2. The Notice informed Mr. Ahmad that there were changed circumstances in his case and ICE had determined that there was a significant likelihood of removal in the reasonably foreseeable future. *Id.* Specifically, ICE had obtained a travel document and was scheduling his removal. *Id.* The Notice also informed Mr. Ahmad that pursuant to 8 C.F.R. § 241.13, he was to remain in ICE custody but would "promptly be afforded an informal interview at which you will be given an opportunity to respond to the reasons for the revocation." *Id.* The Notice went on, "If you are not released after the informal interview, you will receive notification of a new review, which will occur within approximately three months of the date of this notice." *Id.* Mr. Ahmad and Ms. Lynge attest that he never received an informal interview. Dkt. 1-1 at ¶ 19; Dkt. 2 at ¶ 15.

On December 29, 2017, the BIA stayed Mr. Ahmad's removal pending adjudication of his motion to reopen. Dkt. 10 at ¶ 35. Mr. Ahmad's travel document expired while the stay was in effect. *Id.* at ¶ 36; Dkt. 10-1.

On February 23, 2018, Mr. Ahmad initiated the instant habeas action *pro se* to challenge ICE's revocation of his OSUP and his continued detention. Dkt. 1. The Court ordered the Government to file a return memorandum and status report by March 29, 2018. Dkt. 5.

On March 27, 2018, ICE conducted a 90-day file custody review of Mr. Ahmad's detention status and denied release. Dkt. 10 at ¶ 39; Dkt. 14-1. Also on March 27, 2018, the

REPORT AND RECOMMENDATION - 5

1    BIA denied Mr. Ahmad's motion to reopen and the stay of removal expired.[3]  Dkt. 12 at ¶ 3;

2    Dkts. 12-1, 12-2.

3           On March 29, 2018, the Government timely filed a return memorandum and motion to

4    dismiss, arguing that Mr. Ahmad's detention is lawful, that the Court does not have jurisdiction

5    to consider his challenge to the revocation of his release, and that even if the Court has

6    jurisdiction, ICE properly revoked his release.  Dkt. 8.

7           On April 19, 2018, Mr. Ahmad filed in the Ninth Circuit a *pro se* petition for review of

8    the BIA's denial of his motion to reopen and a motion to stay.  Dkt. 14-2.  The Ninth Circuit

9    issued a temporary stay of removal pending briefing on and resolution of the motion to stay.  *Id.*

10   Mr. Ahmad, in his response to the Government's motion to dismiss, asked the Court to continue

11   the instant matter pending the Ninth Circuit's ruling on his motion to stay.  Dkt. 13.  The

12   Government did not oppose this request.  Dkt. 14.  On April 24, 2018, the Court granted Mr.

13   Ahmad's motion for a continuance.  Dkt. 15.

14          On October 10, 2018, the Government informed the Court that the Ninth Circuit had

15   denied Mr. Ahmad's motion to stay on September 19, 2018, and submitted supplemental

16   evidence regarding the likelihood of Mr. Ahmad's removal.  Dkts. 17, 17-1, 18.  Specifically, on

17   October 2, 2018, the Embassy requested a copy of the Ninth Circuit's decision denying Mr.

18   Ahmad's motion to stay so that it could process ICE's request for a new travel document.  Dkt.

19   18 at ¶ 12.  ICE provided the Embassy a copy of the order the same day.  *Id.*  On October 3,

20   2018, the Embassy informed ICE that it would reissue Mr. Ahmad's travel document and a new

21   travel document application would not be required.  *Id.* at ¶ 13.

22          On October 10, 2018, the Court renoted the Government's motion to dismiss for

23

---

[3] The Government did not obtain a copy of the BIA's order until after it filed its motion to dismiss.  *See* Dkt. 12.

REPORT AND RECOMMENDATION - 6

1  November 2, 2018, and granted Mr. Ahmad until October 29, 2018, to provide a supplemental
2  response and additional evidence if he wished.  Dkt. 19.  On October 29, 2018, Mr. Ahmad filed
3  a supplemental brief that requested release so that he could obtain effective treatment for his
4  mental health issues.  Dkt. 22.

## DISCUSSION

6  In his habeas petition, Mr. Ahmad challenges both the revocation of his OSUP and his
7  continued detention.  He argues the governing statute and regulations do not provide for
8  revoking his OSUP without cause, notice, and an opportunity to be heard; detention based on
9  revocation of his OSUP violates due process; his prolonged detention without a bond hearing is
10 unlawful; his detention is unlawful because he does not pose a danger to the community or a
11 flight risk; and the post-order custody review process is constitutionally inadequate.  Dkt. 1 at 6.
12 Mr. Ahmad seeks release from detention so that he can make an orderly departure or, in the
13 alternative, a bond hearing.

14 In moving to dismiss, the Government argues the Court does not have jurisdiction over
15 Mr. Ahmad's challenge to the revocation of his OSUP, and even if it did, ICE properly revoked
16 the OSUP.  Dkt. 8 at 7-10.  The Government also contends that Mr. Ahmad is not entitled to
17 release because he has not provided good reason to believe that his detention is indefinite.  Dkt. 8
18 at 6-7, Dkt. 17.  The Government did not address Mr. Ahmad's request for a bond hearing.

19 As discussed below the Court concludes (1) it has jurisdiction over Mr. Ahmad's claims,
20 (2) ICE lawfully revoked Mr. Ahmad's OSUP but failed to follow all of the regulations, (3)
21 ICE's failure to follow all of the regulations did not violate due process or entitle Mr. Ahmad to
22 release from detention, (4) Mr. Ahmad's prolonged detention is not indefinite, and (5) Mr.
23 Ahmad is entitled to a bond hearing if he is not promptly removed.

REPORT AND RECOMMENDATION - 7

A.      **Subject matter jurisdiction**

The Government asserts that 8 U.S.C. § 1252(g) strips the Court of jurisdiction to consider Mr. Ahmad's challenge to the revocation of his OSUP.  Section 1252(g) provides:

> Except as provided in this section . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any [noncitizen] *arising from* the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any [noncitizen] under this chapter.

8 U.S.C. § 1252(g) (emphasis added).  According to the Government, the revocation of Mr. Ahmad's OSUP is unreviewable in court because it arises from ICE's discretionary decision to execute his removal order.  Dkt. 8 at 8 (citing *Nino v. Johnson*, No. 16-2876, 2016 WL 6995563, at *4 (N.D. Ill. Nov. 30, 2016) (revocation of OSUP "arose from" the decision to execute removal order, and therefore the court lacked jurisdiction)).

The Court disagrees.  Courts have interpreted § 1252(g) narrowly.  *Reno v. Am.-Arab Anti-Discrimination Committee*, 525 U.S. 471, 485 n.9 (1999) ("*AADC*"); *United States v. Hovsepian*, 359 F.3d 1144, 1155 (9th Cir. 2004) (en banc); *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 841 (2018).  Despite the potentially broad scope of the "arising from" language in the statute, the Supreme Court has construed the provision to apply only to the three discrete actions listed: the commencement of proceedings, adjudication of cases, and execution of removal orders.  *AADC*, 525 U.S. at 482; *Jennings*, 138 S. Ct. at 841 ("[In *AADC*, we] did not interpret this language to sweep in any claim that can technically be said to 'arise from' the three listed actions of the Attorney General.  Instead, we read the language to refer to just those three specific actions themselves.").

In challenging the revocation of his OSUP, Mr. Ahmad does not attack ICE's decision to execute his removal order; he challenges his detention prior to his removal.  Such claims may be brought through a habeas petition.  *See Jennings*, 138 S. Ct. at 840-841 (finding jurisdiction over

REPORT AND RECOMMENDATION - 8

challenge to interpretation of pre-removal order detention statute); *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001) (habeas remains "the basic method for obtaining review of continued custody" after a removal order is final); *Singh v. Holder*, 638 F.3d 1196, 1211 (9th Cir. 2011) (as a general rule, noncitizens "may continue to bring collateral legal challenges to the Attorney General's detention authority . . . through a petition for habeas corpus" (quotation omitted, alteration in original)); *Aguilar v. U.S. ICE Div. of Dep't of Homeland Sec.*, 510 F.3d 1, 11 (1st Cir. 2007) ("[D]istrict courts retain jurisdiction over challenges to the legality of detention in the immigration context."); *Alam v. Nielsen*, 312 F. Supp. 3d 574, 579-81 (S.D. Tex. 2018) (finding jurisdiction over challenge to process ICE followed in cancelling petitioner's OSUP and returning him to detention); *Rombot v. Moniz*, 299 F. Supp. 3d 215, 17 (D. Mass. 2017) (finding jurisdiction over challenge to revoking OSUP); *Chhoeun v. Marin*, No. 17-1898, 2018 WL 1941756, at *4-*5 (C.D. Cal. Mar. 26, 2018) (same); *Doe v. Smith*, No. 18-11363, 2018 WL 4696748, at *6 (D. Mass. Oct. 1, 2018) (same). As Mr. Ahmad's claims fall outside the narrow scope of § 1252(g), the Court has jurisdiction.

**B.      Statutory framework for immigration detention**

Title 8 U.S.C. § 1231 governs the detention and release of noncitizens, like Mr. Ahmad, who have been ordered removed. Under § 1231(a), the U.S. Department of Homeland Security ("DHS")[4] is required to detain a noncitizen during the "removal period," which is this case expired years ago. *See* 8 U.S.C. §§ 1231(a)(2), (a)(1)(B). After the removal period ends, DHS

---

[4] Although the relevant statutory sections refer to the Attorney General, the Homeland Security Act of 2002, Pub. L. No. 107-296 § 471, 116 Stat. 2135 (2002), transferred most immigration law enforcement functions from the Department of Justice ("DOJ") to DHS, while the DOJ's Executive Office for Immigration Review retained its role in administering immigration courts and the Board of Immigration Appeals. *See Hernandez v. Ashcroft*, 345 F.3d 824, 828 n.2 (9th Cir. 2003).

REPORT AND RECOMMENDATION - 9

has the discretionary authority to continue to detain certain noncitizens or to release them on supervision. 8 U.S.C. § 1231(a)(6). The Supreme Court has determined that it is "presumptively reasonable" for DHS to detain a noncitizen for six months following entry of a final removal order while it works to remove the individual from the United States. *Zadvydas*, 533 U.S. at 701. Section 1231(a)(6), however, implicitly limits a noncitizen's detention to a period reasonably necessary to bring about that individual's removal from the United States, and does not permit "indefinite" detention. *Zadvydas*, 533 U.S. at 701. Detention is indefinite if there is "no significant likelihood of removal in the reasonably foreseeable future." *Id.*

When detention becomes indefinite, the noncitizen must be released on supervision. *Id.* at 700. If ICE does not release the noncitizen on its own accord, the noncitizen may challenge his or her detention through a petition for writ of habeas corpus. After six months detention, "once the [noncitizen] provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id.* at 701. If the Government fails to rebut the noncitizen's showing, the noncitizen is entitled to release. *Id.*

Title 8 C.F.R. § 241.13 governs the release and revocation of release for noncitizens who are indefinitely detained. With respect to revoking release, the regulation provides, "The Service may revoke [a noncitizen's] release under this section and return the [noncitizen] to custody if, on account of changed circumstances, the Service determines that there is a significant likelihood that the [noncitizen] may be removed in the reasonably foreseeable future." 8 C.F.R. § 241.13(i)(2). The revocation procedures are as follows:

> Upon revocation, the [noncitizen] will be notified of the reasons for revocation of his or her release. The Service will conduct an initial informal interview promptly after his or her return to Service custody to afford the [noncitizen] an opportunity to respond to the reasons for revocation stated in the notification. The

REPORT AND RECOMMENDATION - 10

> [noncitizen] may submit any evidence or information that he or she believes shows there is no significant likelihood he or she [will] be removed in the reasonably foreseeable future . . . . The revocation custody review will include an evaluation of any contested facts relevant to the revocation and a determination whether the facts as determined warrant revocation and further denial of release.

8 C.F.R. § 241.13(i)(3). If the noncitizen is not released from custody following the informal interview, continued detention is governed by 8 C.F.R. § 241.4, which provides for periodic custody reviews. *See* 8 C.F.R. §§ 241.4, 241.13(i)(2).

**C.     Revocation of Mr. Ahmad's OSUP**

Mr. Ahmad makes two arguments with respect to the revocation of his OSUP. First, he contends that the statute and regulations do not provide for re-detention without cause, notice, or an opportunity to be heard. In fact, the regulations require cause, namely a change in circumstances such that there is a significant likelihood that the noncitizen will be removed in the reasonably foreseeable future. 8 C.F.R. § 241.13(i)(2). In this case, ICE had obtained a travel document and scheduled Mr. Ahmad's removal. The regulations do not require notice, and Mr. Ahmad received none. *See generally id.* at § 241.13. And the regulations do require an opportunity to be heard in the form of an informal interview. *Id.* at § 241.13(i)(3). Mr. Ahmad and Ms. Lynge aver that he never received an informal interview. Dkt. 1-1 at ¶ 19; Dkt. 2 at ¶¶ 14-15. The Government fails to rebut their claims with competent evidence.[5] However, the Court cannot discern any actionable injury from this violation of the regulations given that ICE had procured a travel document and scheduled Mr. Ahmad's removal. *See* 8 C.F.R. § 241.13(i)(3) (providing for informal interview so noncitizen may present information showing

---

[5] Deportation Officer Jamie Maldonado declares that Mr. Ahmad "was provided an informal interview at the time he was taken into custody." Dkt. 10 at ¶ 34. Officer Maldonado's statement is based on his review of Mr. Ahmad's ICE file and notes from the previous and current officer in charge of Mr. Ahmad's case, not his personal knowledge. The portion of the record Officer Maldonado cites in support of his claim, the Record of Deportable/Inadmissible Alien, references Mr. Ahmad's re-detention but does not indicate that he received an informal interview. Dkt. 10-3 at 2-3.

REPORT AND RECOMMENDATION - 11

that there is no significant likelihood of removal in the reasonably foreseeable future).  Thus, there is no apparent reason that ICE's failure to provide an informal interview should result in Mr. Ahmad's release.  *See Doe v. Smith*, No. 18-11363, 2018 WL 4696748, at *9-*10 (D. Mass. Oct. 1, 2018) (denial of informal interview does not entitle habeas petitioner to release).

Mr. Ahmad's second argument is that the revocation of his OSUP violated due process.  He cites *Ragbir v. Sessions*, No. 18-236, 2018 WL 623557 (S.D.N.Y. Jan. 29, 2018), in which the court found that due process required ICE to release the petitioner from immigration detention to allow for an orderly departure.  Although there are many similarities between *Ragbir* and the instant case, the key difference is that Mr. Ragbir's OSUP stated, "Once a travel document has been obtained, you will be required to surrender to ICE for removal.  *You will, at that time, be given an opportunity to prepare for an orderly departure*."  *Id.* at *2 n.9 (emphasis added).  ICE made no such promise to Mr. Ahmad.  Given the lack of analogous authority supporting Mr. Ahmad's due process claim, the Court recommends that it be denied.

Although unable to grant Mr. Ahmed the relief he seeks, the Court is appalled by how ICE went about revoking his OSUP.  Mr. Ahmad had given ICE no reason to suspect that he would not comply with the execution of his removal order when the time came.  He already was wearing an ankle monitor.  ICE officers told him that he would be permitted to take a family trip to visit his elderly parents after Christmas.  But instead, they ripped him away from his family without any warning or opportunity to say goodbye.  To make matters worse, the situation was entirely avoidable; ICE could have taken a number of other courses of action that would have lessened the blow of Mr. Ahmad's removal on him and his family.  Were it in the Court's habeas power to remedy the way ICE treated Mr. Ahmad and his family, it would do so.

REPORT AND RECOMMENDATION - 12

**D.      Mr. Ahmad's continued detention**

Mr. Ahmad argues that his continued detention without justification is unlawful. Section 1231(a)(6), however, authorizes ICE to detain Mr. Ahmad because he was ordered removed under 8 U.S.C. § 1227(a)(2). *See* 8 U.S.C. § 1231(a)(6); Dkts. 9-7, 9-10 at 8. And although he cannot be detained indefinitely, as explained above, the evidence before the Court shows that his removal is likely within the reasonably foreseeable future. ICE has obtained travel documents for Mr. Ahmad in the past, and on October 3, 2018, the Embassy indicated that it will reissue a travel document.

Mr. Ahmad also challenges the custody review process and seeks a bond hearing. In the Ninth Circuit, "an individual facing prolonged immigration detention under 8 U.S.C. § 1231(a)(6) is entitled to release on bond unless the government establishes that he is a flight risk or a danger to the community." *Diouf v. Napolitano*, 634 F.3d 1081, 1082 (9th Cir. 2011) ("*Diouf II*"). Specifically, the government must provide a custody hearing before an IJ to noncitizens who are denied release in their six-month DHS custody reviews and whose release or removal is not imminent. *Id.* at 1091-92 ("When detention crosses the six-month threshold and release or removal is not imminent, the private interests at stake are profound. Furthermore, the risk of an erroneous deprivation of liberty in the absence of a hearing before a neutral decisionmaker is substantial."); *see also id.* at 1092 n.13 ("As a general matter, detention is prolonged when it has lasted six months and is expected to continue more than minimally beyond six months.").

Mr. Ahmad has been detained for nearly a year and has not been afforded a bond hearing. This is a clear violation of the requirements of *Diouf II*. It would make little sense to order a bond hearing if Mr. Ahmad's removal is imminent, but if it is delayed more than minimally, then

REPORT AND RECOMMENDATION - 13

he should be given one.  Accordingly, the Court recommends that he be provided with a bond hearing within seven days of Judge Robart's order on this Report and Recommendation, unless he has been removed by that time.

## CONCLUSION AND RIGHT TO OBJECT

The Court recommends (1) with respect to Mr. Ahmad's challenge to the revocation of his OSUP and his request for release, the Government's motion to dismiss, Dkt. 8, should be **GRANTED** and Mr. Ahmad's habeas petition should be **DENIED**, and (2) with respect to Mr. Ahmad's request for a bond hearing, his habeas petition should be **GRANTED** and he should be afforded a bond hearing within seven days of Judge Robart's Order on this Report and Recommendation, if he has not been removed by that time.

This Report and Recommendation is not an appealable order.  Therefore a notice of appeal seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the assigned District Judge enters a judgment in the case.  Objections, however, may be filed and served upon all parties no later than **December 27, 2018.**  The Clerk should note the matter for **December 28, 2018**, as ready for the District Judge's consideration if no objection is filed.  If objections are filed, any response is due within 14 days after being served with the objections.  A party filing an objection must note the matter for the Court's consideration 14 days from the date the objection is filed and served.  The matter will then be ready for the Court's consideration on the date the response is due.  Objections and responses shall not exceed ten pages.  The failure to timely object may affect the right to appeal.

DATED this 4th day of December, 2018.

_____
BRIAN A. TSUCHIDA
Chief United States Magistrate Judge

REPORT AND RECOMMENDATION - 14